## SOL. EPHRAIM vs. BARK "FOREST QUEEN."

IN ADMIRALTY. ON APPEAL FROM CHIEF JUSTICE JUDD.

OCTOBER TERM, 1887.

JUDD, C.J., McCULLY, PRESTON and BICKERTON, JJ. FORNANDER, J., absent.

Three hundred and ninety-nine hogs were shipped from San Francisco to Honolulu, on a bill of lading which contained the special contract, "Freight payable dead or alive. On deck at owner's risk." Forty-two hogs died on the passage from excessive heat, owing to want of a due supply of air.

Held, that a common carrier cannot stipulate for exemption from responsibility when such exemption is not just and reasonable.

That in the transportation of live freight the carrier, in the absence of negligence, is relieved from responsibility from such injuries as occur in consequence of the vitality of the freight.

Held, on the evidence, that the care of the hogs on the passage was left to men employed by the shipper; that the duty of providing for greater supplies of fresh air as the vessel came into warm weather devolved upon them, and not upon the carrier; and that as no negligence was shown on the part of the carrier, it is not responsible for the loss of the hogs.

OPINION OF THE COURT.

Without writing an opinion at length argumentatively and with reference to authorities, in view of the full opinion of the

Chief Justice, and after thoroughly examining the evidence taken in the above case and hearing arguments of counsel, we adopt the opinion of the Chief Justice, from whose judgment this appeal is made, as the opinion of the Court, hereby affirming the same for the reasons stated in his opinion.

*P. Neumann*, for libellant.

*F. M. Hatch*, for respondent.

OPINION OF JUDD, C.J., APPEALED FROM.

This is a libel to recover of the owners of the American bark Forest Queen the sum of six hundred and thirty-two dollars, the value of forty-two hogs alleged to have died on a voyage from San Francisco to Honolulu, by reason of the carelessness and negligence of the persons in charge of the said vessel in " stowing them," and in " keeping them stowed during the voyage."

The bill of lading was signed in San Francisco, California, on the 6th of November, 1886, by the agents of the vessel.

It shows that three hundred and ninety-nine hogs (alive) were shipped in good order and condition in the bark Forest Queen, Winding, master, by the San Francisco Packing and Provision Company, to Sol. Ephraim or his assigns. The bill of lading is in the ordinary form, but has this stipulation written across its face : " Freight payable dead or alive—on deck at owners' risk," which was accepted by the consignor.

It is the law in England by statute, and in the United States by repeated decisions of the highest Courts, that the carrier cannot stipulate for exemption from responsibility when such exemption is not just and reasonable ; and in the United States Supreme Court it is held that an exemption from responsibility for the negligence of the carrier and his servants is not just and reasonable. 2 Waite's Actions and Def., p. 45, *et seq.; R. R. Co. vs. Lockwood,* 17 Wall, 357.

This law is not disputed, and I do not hesitate to adopt it in this case, so far as it is applicable.

"But the general rules which make the common carrier responsible for the safe carriage and delivery of property intrusted to his care, unless he is prevented by the act of God, or of the public enemy, is not applied in its full extent to the carriage of live freight. In the transportation of such freight, in the absence of negligence, the carrier is relieved from responsibility for such injuries as occur in consequence of the vitality of the freight.

"This qualification of the general rule is in principle only an application to live freight of the familiar rule which relieves the carrier from responsibility where chattels perish by natural decay, or the inherent defects of merchandise destroy its value. Animals may injure or destroy themselves or each other, or they may die from fright or starvation, because they refuse to eat, or they may die from heat or cold. In all such cases the carrier is relieved from responsibility if he can show that he has provided all suitable means of transportation, and exercised that degree of care which the nature of the property requires." 2 Waite's Actions and Defenses, pages 31 and 32, and numerous cases there cited.

It is urged on the part of the libellant that the forty-two hogs died from asphyxia, that is, they were suffocated for want of a sufficient supply of fresh air. The pens in which they were placed were built on the deck of the vessel at the ship's expense and under the direction of the owner of the vessel. They were closed at the sides with boards and fence-posts, and had boards laid over the top. Along the middle of the covering of the pens were piled some of the feed for the hogs, sacks of potatoes, and some other merchandise. A board or two at each side of the top-covering was loose, and was taken up when it was necessary to feed the hogs, and this space was left open some of the time for ventilation, but the boards were put back at night for the seamen to walk over while engaged in ship's duty.

I find that the hogs had sufficient room for their accommodation in the vessel. There is no doubt that in cold weather, or when there was a strong breeze blowing, the hogs would not

suffer from undue heat or insufficient ventilation.     But in running from San Francisco to Honolulu, vessels pass through great changes of climate.     Conditions favorable to hogs on leaving San Francisco would not be favorable to their comfort when in the tropics, especially in calm weather.     To be boxed up in a close pen, while proper in cold weather, would be dangerous to the health of these animals in hot weather, for fat hogs are especially susceptible to heat.

There is a good deal of evidence tending to show that the hogs were over-fed, and that the pens were not cleaned out as often as they should have been to insure their health, and these conditions have contributed to their death ; but I am of the opinion from all the testimony that they died from excessive heat, owing to want of a due supply of fresh air.

Upon whom was the responsibility of seeing that when the change of temperature made it necessary, the hogs had plenty of fresh air, cast ?     Upon the captain and officers of the vessel, or upon the consignee who had men in charge of the hogs ?

I think, upon the latter.     The vessel, while it did not absolve itself from this by the exemption in the bill of lading : " Freight payable dead or alive—on deck at owner's risk," as a matter of fact did not assume the care of the animals ; but this was left to men specially engaged for this purpose by the consignee. " On deck at owner's risk " means that the ship is not responsible for loss or damage incident to the hogs being on deck and not in the hold.     " Freight payable dead or alive " does not exempt the ship from the consequence of the captain's or officers' negligence or misconduct ; but the vessel is responsible for the negligence or misconduct of its captain and officers.     For instance, if by placing too heavy merchandise on the pen it had caved in and killed some of the hogs, the vessel would be liable for their value.     But if the pigs had died on account of the men in charge not giving them water, the loss would not fall on the ship.     I think the providing of air was a matter for the consignees' agents to look after.     How could the captain be supposed to be acquainted with their needs in this respect any

more than with their wants as to food or water, or any other condition affecting their health ?

But if the captain of the vessel, his attention having been called to the necessity of greater ventilation in order to save the lives of the hogs, should, when it was a reasonable request, prevent this being obtained, it might be such gross negligence as would render the ship liable for the loss thus occasioned. It is argued by libellant's counsel that this was the state of facts on the Forest Queen.'

Mr. Wendell, the consignee's agent in charge of the hogs, says : " I spoke to the Captain, and asked him if there was any way some air could be made, as the hogs were dying off so fast I was afraid I would have none left when we got to Honolulu." He answered : " What can I do ? I have no place to put the freight."

Captain does not appear to have been examined on this point. The matter seems to have been dropped with this one remark by Mr. Wendell. He did not object to the merchandise being piled on the pens when it was going on board, but his fear was that there was not sufficient superficial space for the hogs in the pens, and his remonstrances were all directed to this.

It seems to me that it was not certainly and sharply brought to the captain's notice that the pigs were being suffocated. He had brought down 510 for Mr. Burke on a previous voyage, and lost but eighteen. The captain says he could not tell what the hogs in question died of. The pens were made to suit the shipper, and alterations could be made to his satisfaction.

The captain suggested to Mr. Wendell that he ought to have more partitions so as to lessen 'the number of hogs in each division, and presumably lessen the damage by their crowding on to and injuring each other, and more partitions were put in by Mr. Wendell on the voyage down. I cannot see why Mr. Wendell did not take off some of the boards from the sides of the pens when he found that the hogs needed more air, and that the potatoes on the pen could not be moved. Captain Winding testifies that Mr. Burke did so on a previous voyage.

I cannot escape the conviction that Mr. Wendell himself did not at the time ascribe the death of the hogs to want of ventilation, or he would have been more vigorous in securing more air for them.

On the whole case I do not find that the loss of the hogs was occasioned by the negligence of those in charge of the vessel, and therefore dismiss the libel.